## CITY OF NEW ORLEANS v. C. B. FOX CO. et al.

### No. 1195.

District Court, E. D. Louisiana.

May 20, 1940.

Rosen Kammer, Wolff & Farrar, of New Orleans, La., for plaintiff

Cobb & Saunders and Charles D. Marshall, all of New Orleans, La., for defendants.

BORAH, District Judge.

This is a suit by the City of New Orleans, by and through the Public Belt Railroad Commission for the City of New Orleans, against C. B. Fox Company, a co-partnership, and the individual members of said firm, for railroad storage charges on export grain shipped to the Port of New Orleans.

The Public Belt Railroad Commission is an agency of the City of New Orleans which operates the Public Belt Railroad as a switching and terminal railroad in the City of New Orleans. It receives, transports and conveys merchandise, freight and other property as an interstate and intra-state common carrier; it receives cars from other railroads engaged in such traffic, and transports and delivers said cars by its railroad system in a continuous interstate movement from other states of the United States to points within Louisiana. Among other things, it switches, transports and delivers grain so handled in interstate commerce to the Public Grain Elevator in the City of New Orleans for export to foreign countries.

The Public Belt Railroad is subject to the jurisdiction of the Interstate Commerce Commission of the United States, and in accordance with the requirements of the Interstate Commerce Act, it filed with the

Interstate Commerce Commission Schedule or Tariff No. 13 (L.C.C. No. 30), which was duly approved by the Interstate Commerce Commission and published by the Public Belt Railroad, as required by the Interstate Commerce Act, a copy of which Tariff has been filed herein as plaintiff's Exhibit "A", and which provides for storage charges on export grain for the Public Elevator as follows:

"Storage

"Export Grain for Public Elevator.

"On Export grain for delivery to Public Elevator, Board of Port Commissioners of the Port, held in cars at the Port of New Orleans, La., or within switching limits, namely: Algiers, Amesville (Marrero), Gouldsboro, Gretna, Harvey, Marrero, Port Chalmette, Westwego, La., ten (10) calendar days' free time will be allowed, free time to be computed from date of arrival on connecting carriers of New Orleans Public Belt Railroad.

"Storage charges to be assessed as follows:

"After expiration of ten days' free time, charge for storage to be $1.00 per car per day or fraction thereof."

During the months of December, 1937, and January, February and March, 1938, the Public Belt Railroad received from its connecting inbound railroad carriers in the City of New Orleans cars of grain shipped from points outside of the State of Louisiana and consigned to the defendant, C. B. Fox Company, and said cars were delivered by the connecting carriers to the Public Belt Railroad and by it transported in a continuous movement to the Public Grain Elevator in New Orleans, for export to foreign countries, for account of C. B. Fox Company. During this period and during the course of the arrival of said cars on the tracks of the Public Belt Railroad, or its connecting carriers, there arose an unusual and excessive congestion of cars of grain in New Orleans, which was so great that the Public Grain Elevator was unable to receive the cars of grain tendered at the time of arrival. Because of this condition the Public Belt Railroad and its connecting carriers were compelled to hold said cars of grain for the various consignees thereof, including the defendant, C. B. Fox Company, until such time as the Public Grain Elevator was able to receive them. The total amount of storage charges claimed by plaintiff against C. B. Fox Com-

pany was $16,318 on account of which C. B. Fox Company had paid the sum of $5,-299.70, leaving unpaid a total amount of $11,018.30. At the time of the institution of the suit, the connecting carriers whose cars were involved were Illinois Central Railroad, Missouri Pacific Railroad, Gulf, Mobile & Northern Railroad, Southern Railway, Louisville & Nashville Railroad, and Louisiana & Arkansas Railroad. Of the total amount of $16,318 storage charges, $10,698 was applicable to cars of the Illinois Central Railroad.

Before trial on the merits, a settlement was effected with respect to the cars delivered to plaintiff by the Illinois Central Railroad. As a result of such settlement, the counter-claim of defendants was withdrawn, and the amount of plaintiff's demand was reduced by the sum of $5,398.30. Accordingly, the amount left in dispute was $5,620; being the difference between $11,-018.30 and $5,398.30. This amount of $5,620 was later reduced to $5,565 by certain corrections, and is allocated among the cars of the other railroads as follows:

| | |
|---|---:|
| Missouri Pacific | $3,758.00 |
| Gulf, Mobile & Northern | 1,160.00 |
| Southern Railway | 589.00 |
| Louisville & Nashville | 43.00 |
| Louisiana & Arkansas | 15.00 |
| Total | $5,565.00 |

At a pre-trial conference, it was agreed that plaintiff and defendants each would appoint a representative to examine the original records of the railroads and the Public Grain Elevator for the purpose of: (1) Checking Exhibits "D" and "E", respectively, attached to plaintiff's original and supplemental petitions; which exhibits were compilations prepared by plaintiff showing the amount of storage claimed to be due by defendants; and (2) compiling the facts applicable to the defense of the defendants that the cars upon which plaintiff was claiming storage were not delivered in the order of their arrival dates. Plaintiff appointed A. M. France and defendants appointed Thomas J. Root, who together examined the original records of the railroads and the Public Grain Elevator, and prepared detailed statements contained in the record entitled "Corrections to Exhibit D" and "Corrections to Exhibit E". Thomas J. Root compiled defendants' Exhibits "B", "C" and "D", which were offered in evi-

dence by defendants. Plaintiff objected to the offer but admitted the correctness of the facts stated therein. Subsequently, an order was signed approving the correctness of the facts set forth in all of said exhibits.

For the purposes of this case, it will suffice to refer to the recapitulation made by France and Root, which is attached to said "Corrections to Exhibit E". This recapitulation shows (a) the amount of storage covering the cars of the various railroads involved; (b) the storage claimed on cars of the Illinois Central which were held by it at Harahan, a point which defendants claimed was outside of the switching limits of the City of New Orleans, and therefore not embraced within the provisions of the Tariff; (c) the storage claimed on cars of the Gulf, Mobile & Northern Railroad, held by it at Bogalusa, which defendants claimed was outside of the switching limits of the City of New Orleans; (d) the differences in computing the storage from the dates of arrival of the cars (as contended for by plaintiff) and the dates of notices of arrival of the cars (as contended for by defendants); (e) the total of the exceptions set forth above; and (f) the balance of storage due if all of the said exceptions were allowed. This recapitulation shows that the storage charges on cars of the Illinois Central amounted to $10,698 of which $5,542 represented storage charges on cars held by the Illinois Central at Harahan. These charges on cars of the Illinois Central Railroad were all eliminated from the case on account of the settlement above referred to. With respect to the cars of the other railroads, the recapitulation shows storage charges amounting to $5,565 as set forth above, assessed at the rate of $1 per car per day, after the lapse of ten days free time from the dates of arrival on the lines of all of the connecting carriers except the Missouri Pacific Railroad, as to which the storage charges have been assessed at the rate of $1 per car per day after the lapse of ten days free time from the dates of notice of arrival by the Missouri Pacific Railroad on the lines of said Missouri Pacific Railroad. In all cases, notices of arrival were given by the connecting lines, but not by the Public Belt Railroad. The above recapitulation shows that the difference in the assessment of storage charges calculated from the dates of arrival of the cars and the dates of notice of arrival of the cars amounts to $21, as hereinafter in detail set forth. Included in the amount of $5,565 is the said sum of $21, and also the sum of $473 storage charges assessed on cars of the Gulf, Mobile & Northern Railroad, while the cars were held by that railroad at Bogalusa awaiting delivery to the Public Grain Elevator.

The exceptions claimed by defendants shown on said recapitulation are as follows:

(a) Storage charges amounting to $473 on cars of the Gulf, Mobile & Northern held by it at Bogalusa; and (b) $21 on account of the difference between computing the storage charges on the cars of the Gulf, Mobile & Northern, Southern Railway, Louisville & Nashville, and Louisiana & Arkansas Railroads, from the dates of arrival and the dates of notices of arrival, as follows: On cars of

| | |
|---|---|
| Gulf, Mobile & Northern, | $ 9.00 |
| Southern Railway, | 4.00 |
| Louisville & Nashville, | 7.00 |
| Louisiana & Arkansas, | 1.00 |
| Total, | $21.00 |

In addition, defendants also claim a deduction of $455 because certain of the cars which were delivered to C. B. Fox Company were in fact owned by Norris Grain Company, and defendants contend that W. B. Fox, individually, was acting under a written power of attorney as the agent of Norris Grain Company, in surrendering the bills of lading therefor, and that defendant, C. B. Fox Company, paid the freight charges thereon for the account of Norris Grain Company, but that neither C. B. Fox Company nor W. B. Fox ever accepted delivery of these cars or had any beneficial interest therein, and accordingly, that they should not be charged with the storage on said cars. Defendants attached to their answer Defendants' Exhibit "A", which gives a list of the Norris Grain Company cars that defendants claim did not belong to C. B. Fox Company. A. M. France compiled a statement which was introduced in evidence as Plaintiff's Exhibit "G", showing in detail the cars shipped by Norris Grain Company, which C. B. Fox Company claims were not owned by it. This statement shows that the total storage charges claimed on said cars amounted to $455 (exclusive of the cars of the Illinois Central which were eliminated from the case as hereinabove stated).

The other defenses raised by defendants in their answer are these: (a) That plaintiff has no right to collect storage charges on cars while on the tracks of plaintiff's connecting carriers; (b) that the connecting carriers solicited the shipments of grain from shippers, although they knew of the congestion in New Orleans; and (c) that plaintiff failed to deliver the cars to the Public Grain Elevator in the order of arrival, but delivered some of the cars arriving at a later date ahead of cars arriving at an earlier date, and that these so-called "run-arounds" increased the storage charges on the earlier arrivals.

■ With respect to the various defenses of defendants:

Defendants contend that they are entitled to a deduction of $21, representing the difference between the charges for storage computed from the dates of arrival, and the dates of notice of arrival. This contention is based upon the fact that Section 4 of the bill of lading provides: "Section 4. (a) Property not removed by the party entitled to receive it within the free time allowed by tariffs, lawfully on file (such free time to be computed as therein provided), after notice of the arrival of the property at destination or at the port of export (if intended for export) has been duly set or given, and after placement of the property for delivery at destination has been made, may be kept in vessel, car, depot, warehouse or place of delivery of the carrier, subject to the tariff charge for storage and to carrier's responsibility as warehouseman, only, or at the option of the carrier, may be removed to and stored in a public or licensed warehouse at the place of delivery or other available place, at the cost of the owner, and there held without liability on the part of the carrier, and subject to a lien for all freight and other lawful charges including a reasonable charge for storage."

This contention is without force. The tariff controls the provisions of the bill of lading, and Tariff No. 13 of the Public Belt Railroad provides:

" * * * ten (10) calendar days' free time will be allowed, free time to be computed from the date of arrival on connecting carriers of New Orleans Public Belt Railroad.

"Storage charges to be assessed as follows:

"After expiration of ten days' free time, charge for storage to be $1.00 per car per day or fraction thereof."

■ Defendants contend that they are entitled to a deduction of $455 for storage charges on cars consigned to Norris Grain Company, notify C. B. Fox Company, on the ground that C. B. Fox Company was acting merely as the agent for Norris Grain Company. However, the evidence in this case shows that the power of attorney in question was a power of attorney to W. B. Fox, designated therein as a partner of C. B. Fox Company, to deal with the banks holding the bills of lading, and to authorize him to receive the same in trust and to account to the banks therefor; that C. B. Fox Company paid the freight charges; that C. B. Fox Company surrendered the bills of lading, and that C. B. Fox Company gave the railroads written orders for the delivery of the cars to the Public Grain Elevator; and that C. B. Fox Company, and not W. B. Fox, individually, received all remuneration for handling said cars. The evidence further shows that the bills of lading for all cars shipped by Norris Grain Company to their own order, notify C. B. Fox Company, were endorsed by Norris Grain Company.

The non-recourse clause on all of said bills of lading provides as follows:

"Subject to Section 7 of the conditions, if this shipment is to be delivered to the consignee without recourse on the consignor, the consignor shall sign the following statement:

"The carrier shall not make delivery of this shipment without payment of freight and all other lawful charges.

"_____,

"Signature of Consignor."

Section 7 of all of said bills of lading provides as follows: "The owner or consignee shall pay the freight and average, if any, and all other lawful charges accruing on said property; * * * Provided, that, where the carrier has been instructed by the shipper or consignor to deliver said property to a consignee other than the shipper or consignor, such consignee shall not be legally liable for transportation charges in respect of the transportation of said property (beyond those billed against him at the time of delivery for which he is otherwise liable) which may be found to be due after the property has been delivered to him, if the consignee (a) is an agent only

and has no beneficial title in said property, and (b) prior to delivery of said property has notified the delivering carrier in writing of the fact of such agency and absence of beneficial title * * *".

The evidence further shows that no notice was given either by C. B. Fox Company, or W. B. Fox, individually, to any of the railroads when the bills of lading were surrendered and prior to the delivery of the property, either in writing or otherwise, of the fact that either W. B. Fox or C. B. Fox Company acted only as agent and had no beneficial title in the property. Accordingly, when C. B. Fox Company accepted delivery of the cars by surrendering the bills of lading duly endorsed, and paying the freight charges thereon without notifying the railroads that they were acting as the agents for Norris Grain Company and that they had no beneficial title in the property, they became, so far as plaintiff was concerned, the consignee of the cars and liable for all charges thereon within the terms of the Tariff.

■ Defendants claim that they are entitled to a deduction of $473 covering storage on certain cars held by the Gulf, Mobile & Northern Railroad at Bogalusa, on the ground that Bogalusa is outside of the "Port of New Orleans", and therefore not included within the terms of the Tariff.

It is not disputed that the cars in question were held at Bogalusa where the railroad had storage facilities, because of the then existing congestion in New Orleans; that the railroad always had about one hundred cars on its tracks in New Orleans for ready delivery; and that the cars in Bogalusa could be delivered within six hours after notice. However, since Bogalusa is not specifically named as one of the places within the switching limits of the Port of New Orleans, plaintiff cannot recover storage charges on these specific cars.

■ Defendants contend that they are not liable for storage while the cars were held on the tracks of connecting carriers, but only for that portion of the time that the cars were held on the tracks of the Public Belt Railroad. This contention is answered by the Tariff itself, which provides:

"Free time to be computed from date of arrival on connecting carriers · of New Orleans Public Belt Railroad"; and

"Storage charges to assessed as follows:

"After expiration of 10 days free time, charge for storage to be $1.00 per car per day or fraction thereof."

■ Defendants further contend that the connecting carriers solicited shipments of grain from the shippers although said connecting carriers knew of the congestion at the Port of New Orleans, and that since this congestion caused the accumulation of storage charges, the Public Belt Railroad is not entitled to collect said charges.

Plaintiff objected to the introduction of any testimony by defendants as to this defense, on the ground that it was irrelevant, because Tariff No. 13 controls the rights of the parties, and further because any alleged acts of the connecting carriers cannot defeat the right of plaintiff to collect the storage charges legally due under said Tariff. The Court, having reserved its ruling, is now of the opinion that this objection was well founded, and that the testimony should have been excluded. In any event, the testimony offered was insufficient to sustain any such defense had the testimony been considered. ·

■ The remaining defense made by defendants relates to the question of "run-arounds". All of the testimony concerning "run-arounds" was objected to by plaintiff on the ground that the answer contained no allegation charging plaintiff specifically with having made any such "run-arounds", or charging it in any way with discriminating in favor of one shipper or consignee against others. No specific claims for deductions were made in the answer, nor were any specific claims on account of "run-arounds" made at the trial. The only testimony offered by defendants was the compilation of Thomas J. Root, defendants' representative, which gave the initials and numbers of the cars, the dates of arrival, the names of the consignees, the dates the cars were delivered to the Public Belt Railroad, the release dates of the cars, and the yards at which the cars were held.

The testimony in this case shows that during the month of December, 1937, there began to accumulate in barges in the river and in cars grain in excess of the ability of the Elevator to unload as it arrived. The grain contained a high percentage of moisture, and since the Elevator could handle only about 35,000 bushels a day, it was found that it would be necessary to keep the drier working for about 30 or 40

days to take care of the grain then in New Orleans. An account of this condition, a conference was called among the representatives of the railroads, the Public Grain Elevator and the grain exporters, at which this condition was pointed out and discussed. The grain exporters requested that nothing be done to stop the movement of grain into the Port of New Orleans, because they believed that weather conditions in the loading territory would improve, and that there would be very little high moisture grain coming into the Port of New Orleans thereafter. The hopes of the grain exporters were not justified by the conditions as they turned out, as high moisture grain continued to come into the Port. The grain being sold for export was No. 2 grade, and in order to load the ships that were available, it became necessary for the Elevator to order cars of grain that would fit the grade required by said ships. It finally became necessary for the exporters to change the grade of the grain and export No. 3 grade, to further relieve the situation of high moisture grain coming into the Port, a large amount of which was beginning to deteriorate. The Elevator was continually faced with the difficulty of deciding which cars were going to be handled, and the only position the Elevator could possibly take was to protect the grain that was in the Port from deterioration. When this condition became acute, another meeting was called at which W. B. Fox, a member of the firm of C. B. Fox Company, was appointed to handle the matter for the best interests of all concerned. W. B. Fox, after he took charge, gave instructions, some written, some oral, to the Public Belt Railroad, to deliver specific cars to the Elevator. In all instances, his instructions were carried out. In selecting the cars of grain to be delivered to the Elevator, he first had all of the cars graded by the railroads and their moisture content determined, and he selected the cars for delivery to the Elevator on a pro-rata basis, as nearly as he could from day to day. If the cars had been delivered in the order of arrival, hundreds of thousands of bushels would have been lost and, with few exceptions, this was obviated by the above method of handling.

Since W. B. Fox, defendants' only witness, admitted that all of the cars in question were delivered by the Public Belt Railroad in accordance with his own written and oral instructions, the proper foundation for any alleged "run-arounds"

was not proved, and accordingly, the compilations prepared by Thomas J. Root should be excluded from the case. Furthermore, on the merits, defendants failed to sustain this defense, as the Public Belt Railroad specifically carried out all orders from W. B. Fox, one of the partners of C. B. Fox Company. Defendants cannot be heard to complain that plaintiff carried out its own instructions with respect to delivery of the cars to the Public Grain Elevator.

■ This case having been tried by the Court without the intervention of a jury, the Court in compliance with Rule 52 of the Federal Rules of Civil Procedure, 28 U.S. C.A. following section 723c, makes the following

### Findings of Fact

Tariff No. 13 (I.C.C. No. 30) provides in part as follows:

"Storage

"Export Grain for Public Elevator.

"On export grain for delivery to Public Elevator, Board of Port Commissioners of the Port, held in cars at the Port of New Orleans, La., or within switching limits, namely: Algiers, Amesville (Marrero), Gouldsboro, Gretna, Harvey, Marrero, Port Chalmette, Westwego, La., ten (10) calendar days' free time will be allowed, free time to be computed from date of arrival on connecting carriers of New Orleans Public Belt Railroad.

"Storage charges to be assessed as follows:

"After expiration of ten days' free time, charge for storage to be $1.00 per car per, day or fraction thereof."

Section 4 of the bill of lading in controversy provides: "Section 4. (a) Property not removed by the party entitled to receive it within the free time allowed by tariffs, lawfully on file (such free time to be computed as therein provided), after notice of the arrival of the property at destination or at the port of export (if intended for export) has been duly set or given, and after placement of the property for delivery at destination has been made, may be kept in vessel, car depot, warehouse or place of delivery of the carrier, subject to the tariff charge for storage and to carrier's responsibility as warehouseman, only, or at the option of the carrier, may be removed to and stored in a public or licensed warehouse at the place of delivery

or other available place at the cost of the owner, and there held without liability on the part of the carrier, and subject to a lien for all freight and other lawful charges including a reasonable charge for storage."

The cars held by the Gulf, Mobile & Northern Railroad were held at Bogalusa where the railroad had storage facilities because of the then existing congestion at New Orleans.

The Gulf, Mobile & Northern Railroad always had about one hundred cars on its tracks in New Orleans for ready delivery, and the cars in Bogalusa could be delivered within six hours after notice.

The power of attorney from Norris Grain Company was to W. B. Fox, designated therein as a partner of C. B. Fox Company, to deal with the banks holding the bills of lading, and to authorize him to receive the same in trust and to account to the banks therefor; C. B. Fox Company paid the freight charges; surrendered the bills of lading; gave the railroads written orders for the delivery of the cars to the Public Grain Elevator and received all remuneration for handling the cars.

The bills of lading for all cars shipped by Norris Grain Company to their own order, notify C. B. Fox Company, were endorsed by Norris Grain Company.

The non-recourse clause of all of said bills of lading provides as follows:

"Subject to Section 7 of the conditions, if this shipment is to be delivered to the consignee without recourse on the consignor, the consignor shall sign the following statement:

"The carrier shall not make delivery of this shipment without payment of freight and all other lawful charges.

"_____,

"Signature of Consignor."

Section 7 of all of said bills of lading provides as follows: "The owner or consignee shall pay the freight and average, if any, and all other lawful charges accruing on said property; * * * Provided, that, where the carrier has been instructed by the shipper or consignor to deliver said property to a consignee other than the shipper or consignor, such consignee shall not be legally liable for transportation charges in respect of the transportation of said property (beyond those billed against him at the time of delivery for which he is otherwise liable) which may be found to be due after the property has been delivered to him, if the consignee (a) is an agent only and has no beneficial title in said property, and (b) prior to delivery of said property has notified the delivering carrier in writing of the fact of such agency and absence of beneficial title * * *".

No notice was given by C. B. Fox Company or W. B. Fox, individually, to any of the railroads when the bills of lading were surrendered and prior to the delivery of the property of the fact that either of them acted only as agent and had no beneficial title in the property.

During the month of December, 1937, there began to accumulate in the Port of New Orleans grain in excess of the ability of the Elevator to unload as it arrived. The grain contained a high percentage of moisture, and since the Elevator could handle only about 35,000 bushels a day, it was found that it would be necessary to keep the dryer working for about 35 or 40 days to take care of the grain then in New Orleans.

A conference was called among the representatives of the railroads, the Public Grain Elevator and the grain exporters to discuss the congested conditions that existed in the Port. At this conference the grain exporters requested that nothing be done to stop the movement of grain into the Port of New Orleans because they believed that weather conditions in the loading territory would improve and there would be very little high moisture grain coming into the Port thereafter. The hopes of the grain exporters were not justified as high moisture grain continued to come into the Port.

The grain which was being sold for export was No. 2 grain and in order to load the ships that were available it became necessary for the Elevator to order cars of grain that would fit the grade required by said ships, and it finally became necessary for the exporters to change the grade of the grain and export No. 3 grain to further relieve the situation of high moisture grain coming into the Port, a large amount of which was beginning to deteriorate.

When the congested condition in the Port of New Orleans became acute another meeting was called at which W. B. Fox, a member of the firm of C. B. Fox Company, was appointed to handle the matter for the best interests of all concerned. W. B. Fox, after he took charge, gave instructions to

the Public Belt Railroad to deliver specific cars to the Elevator, and in all instances his instructions were carried out. In selecting the cars of grain to be delivered to the Elevator he first had all the cars graded by the railroads and their moisture content determined, and he selected the cars for delivery to the Elevator on a pro-rata basis as nearly as he could from day to day. Had the cars been delivered in the order of arrival, hundreds of thousands of bushels would have been lost and, with few exceptions, this was obviated by the above method of handling.

### Conclusions of Law

■ Section 41 of the U.S.C., title 28, 28 U.S.C.A. § 41 (Judicial Code Sec. 24, as amended), vests jurisdiction in the District Courts of the United States in all suits and proceedings arising out of any law regulating commerce.

■ Tariff No. 13 (I.C.C. No. 30) is the law between the parties, and it is not only the right of plaintiff, but also its duty, under the law to collect the proper tariff charges. Texas & Pacific R. R. v. Mugg & Dryden, 202 U.S. 242, 26 S.Ct. 628, 50 L.Ed. 1011; Pittsburgh, Cincinnati, Chicago & St. Louis Ry. Co. v. Fink, 250 U.S. 577, 40 S.Ct. 27, 63 L.Ed. 1151.

■ The demurrage rules in Tariff No. 13 have no application to the storage tariff which is complete in itself.

■ The tariff controls the provisions of the bill of lading; accordingly, defendants' contention that they are entitled to a deduction of $21, representing the difference between the charges for storage computed from the dates of arrival and the dates of notice of arrival, is rejected, and plaintiff's right to recover said amount is hereby recognized.

Plaintiff's claim that it is entitled to recover $473 covering storage on certain cars held by the Gulf, Mobile & Northern Railroad at Bogalusa is rejected on the ground that Bogalusa is outside of the Port of New Orleans and is not specifically named as one of the places within the switching limits of New Orleans and therefore not included within the terms of the Tariff.

When C. B. Fox Company accepted delivery of the cars of the Norris Grain Company by surrendering the bills of lading duly endorsed, and paying the freight charges thereon without notifying the railroads that they were acting as the agents for Norris Grain Company and that they had no beneficial title in the property, they became, so far as plaintiff was concerned, the consignee of the cars and liable for all charges thereon within the terms of the Tariff. Accordingly, defendants are not entitled to a deduction of $455 for storage charges on these cars consigned to Norris Grain Company, notify C. B. Fox Company, on the ground that C. B. Fox Company was acting merely as the agent for Norris Grain Company, but on the contrary plaintiff is entitled to recover this item. Wabash Railway Co. v. Bloomgarden, 212 Mich. 410, 180 N.W. 443; Michigan Central R. R. Co. v. Saginaw Milling Co., 272 Mich. 625, 262 N.W. 425.

The contention of defendants that they are not liable for storage while the cars were held on the tracks of connecting carriers, but only for that portion of the time that the cars were held on the tracks of the Public Belt Railroad, is without merit.

The contention of defendants that the connecting carriers solicited shipments of grain from the shippers although they knew of the congestion at the Port of New Orleans, and that the Public Belt Railroad is not entitled to collect said charges since this congestion caused an accumulation of storage charges, is without merit.

A proper foundation for any alleged "run-arounds" was not proven by defendants. Furthermore, defendants cannot be heard to complain that plaintiff carried out its own instructions with respect to delivery of the cars to the Public Grain Elevator.

The Clerk is accordingly directed to enter judgment in favor of plaintiff and against C. B. Fox Company and Succession of Chrichton B. Fox and Willoughby B. Fox, the individual members of said firm, in solido, in the sum of $5,092, being $5,565 less $473, covering storage on the cars held at Bogalusa by the Gulf, Mobile & Northern Railroad, with 5% per annum interest from judicial demand, and for all costs of suit.